## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Case No. 2:23-cr-00009** |
| **v.** | : | |
| | : | |
| **RODNEY ALLEN PICKETT** | : | |

### UNITED STATES' MOTION TO DISMISS IN RESPONSE TO PETITIONER'S MOTION FOR RELIEF PURSUANT TO TITLE 28, UNITED STATES CODE, SECTION 2255

The United States of America, by counsel, files this Reply and Motion to Dismiss in response to Petitioner's motion for relief under Title 28, United State Code § 2255. Petitioner Rodney Allen Pickett ("Pickett") has failed to allege any facts which entitle him to relief or to a hearing, making this Petition ripe for summary disposition with prejudice.

### INTRODUCTION

Pickett filed a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 on July 28, 2025. ECF No. 178. Pickett was convicted by a jury on eight counts—one count of a 500-gram methamphetamine distribution conspiracy, three methamphetamine distribution counts, possessing over 500 grams of methamphetamine with intent to distribute, and several gun charges, including possessing one firearm in furtherance of a drug crime. ECF No. 133. He asserts the following claims:

(1) His attorneys were ineffective because they failed to assert Pickett's right to a speedy trial.

(2) His attorneys were ineffective because they failed to develop an adequate defense. Specifically, he claims his attorneys: 1) failed to request forensic testing of physical

1

evidence, 2) failed to obtain and present video evidence from Pickett's surveillance system and law enforcement body cameras, and 3) failed to request access and view the entire controlled buy videos.

(3) One of his attorneys was ineffective based upon a conflict of interest.

For the following reasons, he has not stated a claim upon which relief can be granted, and his petition should be dismissed.

## FACTS AND PROCEDURAL HISTORY

On April 24, 2023, Pickett was arrested and had his initial appearance on a criminal complaint alleging violations of drug trafficking and firearms laws. ECF Nos. 3, 7, 12. On the same date, Jay Steele was appointed as counsel for Pickett. ECF No. 9.

Subsequently, on May 24, 2023, Pickett was indicted for one count of conspiring to distribute and possess with intent to distribute 500 grams or more of methamphetamine; three distribution of methamphetamine counts, stemming from three controlled buys; one count of possessing 500 grams of methamphetamine with intent to distribute, stemming from a search of his home; and three firearm charges—being a felon in possession of a gun, having a gun in furtherance of a drug crime, and possessing a machine gun—all also stemming from the search of his home. ECF No. 24.[1]

On June 1, 2023, Pickett was arraigned and his trial was set to begin on July 18, 2023. ECF Nos. 29, 31. On June 14, 2023, following a hearing, the Court granted Mr. Steele's motion to

---

[1] A Superseding Indictment on June 27, 2023, added a count of possessing unregistered firearms, specifically three firearm silencers, and made other minor changes to the initial indictment. ECF No. 60. A Second Superseding Indictment on January 23, 2024, did not add or subtract any charges and only made minor changes. ECF No. 106.

withdraw as counsel for Pickett and subsequently appointed John Jessee to represent Pickett. ECF No. 45, 49, 54.

On June 20, 2023, the government moved to continue trial based upon the unavailability of a witness essential to the government's case. ECF No. 56. Mr. Jessee filed a response specifically noting Pickett's opposition to the continuance and his refusal to waive his rights under the Speedy Trial Act. ECF No. 59. However, Mr. Jessee noted that, as recently appointed counsel, he would not have sufficient time to effectively prepare to represent Pickett's interests at trial, taking into account the exercise of due diligence, without a continuance. *Id.*

On June 29, 2023, the Court granted the government's motion to continue and ordered that the period of time necessitated by the continuance was excluded for speedy trial purposes pursuant to 18 U.S.C. § 3161(h)(3), (7). ECF No. 63. Thereafter, trial was scheduled to begin on February 12, 2024. ECF 73.

On October 10, 2024, following a hearing, the Court granted Mr. Jessee's motion to withdraw as counsel for Pickett and subsequently appointed Donald Williams to represent Pickett. ECF No. 81, 86, 90. After his appointment, Mr. Williams reviewed the evidence related to Pickett's case and learned that two of the law enforcement officers involved in the investigation were Mr. Williams' clients in unrelated matters. ECF No. 93. Upon learning this, Mr. Williams filed a motion to withdraw as counsel on November 24, 2023, which was granted. ECF Nos. 93, 94. By order dated November 28, 2023, Charles Bledsoe was substituted as Pickett's counsel. ECF No. 94.

Pickett's trial began on February 14, 2024,[2] and the trial evidence proved Pickett sold methamphetamine to a confidential informant on three occasions and was found in possession of a firearm, ammunition, and firearm silencers. The evidence also proved that Pickett possessed a gun in furtherance of a drug crime and conspired with others to distribute and possess with intent to distribute 500 grams or more of methamphetamine within the Western District of Virginia.

At trial, both Wise County Investigator Michael Storie and a confidential informant (CI) testified regarding controlled purchases of methamphetamine from Pickett at Pickett's home that occurred on January 19, February 8, and February 9, 2023. Each purchase was recorded on video and obtained 3.5 grams, 2 grams, and one ounce (28 grams) of methamphetamine, respectively. ECF No. 163 at 194-229

Coeburn Police Officer Westley Swindall testified regarding his search of Pickett's home in Coeburn, Virginia, on March 3, 2023. ECF No. 165 at 6-81. Officer Swindall explained that he arrived at Pickett's home with an arrest warrant for a fugitive. James Looney initially answered the door and retrieved Pickett from Pickett's room. Pickett then gave Officer Swindall permission to search the residence for the fugitive, and Officer Swindall noticed ammunition in plain view inside of Pickett's bedroom. *Id.* at 9-10, 16. Officer Swindall found guns and additional ammunition in the home in the initial search, which prompted him to obtain a search warrant for the home, during which he found more firearms and ammunition, as well as methamphetamine. *Id.* at 11-13.

During the warrant-authorized search, officers found methamphetamine inside a safe within Pickett's bedroom closet, as well as two silencers. *Id.* at 21-26. Additionally, at the foot of

---

[2] On January 19, 2024, the Court *sua sponte* rescheduled trial to begin on February 14, 2024, rather than February 12, 2024. ECF No. 101.

Pickett's bed, a wooden box contained digital scales, small baggies, and more methamphetamine. *Id.* at 27. Officer Swindall explained that digital scales and small plastic baggies are often used by drug dealers to weigh out their product and package it for distribution. *Id.* at 29-30. A different, black box was found at the foot of Pickett's bed and also contained methamphetamine. *Id.* at 30-31. Officer Swindall further recovered a pistol case and ammunition at the foot of Pickett's bed. *Id.* at 35. Security cameras inside Pickett's home also were pointed at Pickett's bedroom door. *Id.* at 42.

All told, approximately 523 grams of methamphetamine were discovered in Pickett's bedroom, a quantity Officer Swindall explained was "definitely going to be a distribution quantity" and was "a very large amount of methamphetamine," since personal use of the drug "typically is a gram" or three. *Id.* at 34-35. A total of three firearm silencers, one of which was attached to a firearm, five firearms, and numerous firearm parts, magazines (some of which were high capacity), and ammunition were found in the home. *Id.* at 23-63. There was also a drill press with an AR-15 lower attached, and evidence that the drill press was being used to modify firearms. *Id.* at 40-43. Firearms, firearm parts, and ammunition were in plain view throughout the home. *Id.* at 73.

Seventeen-year ATF Special Agent Steve Levesque testified as an expert on "the ways, means, and manners of methamphetamine distribution in Southwest Virginia." Agent Levesque had been involved in his career with over four dozen methamphetamine trafficking investigations. Agent Levesque opined that, while personal use quantities of methamphetamine could be as much as 3 grams a day, 444 grams and 77 grams (the amounts found in Pickett's bedroom) were distribution quantities. Agent Levesque explained that drug dealers typically use plastic "baggies to separate their drugs for sell" and digital scales to weigh the amounts. Finally, Agent Levesque testified that drug dealers typically carry firearms "to protect themselves," because they are

carrying large amounts of either money or valuable drugs, and "it's a violent industry." *Id.* at 211-227.

James Looney, one of Pickett's indicted co-conspirators, testified at trial. *Id.* at 89-132. Looney explained that, after meeting Pickett in 2022, he had a "drug relationship" with Pickett, the nature of which was "I was bringing him pounds of meth." *Id.* at 98; accord *Id.* at 127 ("I was selling Pickett pounds and pounds a week."). Looney testified that initially Pickett "was using the third party [intermediary] to come to" Looney for methamphetamine, but after Pickett "ended up accusing her of stealing drugs and a firearm from him," Pickett "split ways with her and started coming directly to" Looney. *Id.* at 104-105.

Once Looney began selling methamphetamine directly to Pickett, their drug deals spanned about six months (approximately October 2022 to March 2023), initially a pound at a time, once or twice a week. *Id.* at 105. Eventually, Pickett began purchasing as much as two pounds of methamphetamine at a time, with Looney testifying there was a period when Pickett bought that much every couple of days. *Id.* at 106. Pickett paid Looney up to $3,500 for one pound of product and up to $7,500 for two pounds. *Id.* Thus, using even a conservative estimate—20 pounds (1lb./week for 5 months) times 453 (grams/pound)—Pickett bought over 9,000 grams of methamphetamine from Looney. As Pickett's counsel elicited on cross, the actual amount of the drugs could have been two or three times that. *Id.* at 119.

These drug deals usually took place at Pickett's house, although sometimes Pickett sent couriers (who Looney identified by name, including James LaForce and Chasity Holbrook) to Looney's house (or came himself) to pick up the drugs. *Id.* at 108-109. When the deals took place at Pickett's home, the men went to Pickett's bedroom and "tried to be sure it was just us two." *Id.* at 107-108. When Pickett used couriers, he and Looney coordinated the deals using a "master

money bag"—bags with keys that each man possessed so they could securely send their drugs and money with the couriers. *Id.* at 108.

Looney testified he and Pickett knew that the drugs he sold to Pickett were for resale: Pickett "was selling [Looney's meth], distributing it in small increments for a profit," which Looney knew because he had "seen it." *Id.* at 107. Looney witnessed other occasions of Pickett dealing meth with other people in addition to Looney. *Id.* at 111. Looney also explained Pickett stored Pickett's methamphetamine in a safe in Pickett's closet, and routinely carried a gun during drug deals. *Id.* at 110, 114.

Looney also testified about Pickett's possession and use of firearms and firearm silencers. *Id.* at 112-118. He stated that guns were at Pickett's house during drug transactions, including an AR assault rifle that was set up in Pickett's bedroom. *Id.* at 112-113. These guns were out in the open. *Id.* Pickett told Looney about occasions when Pickett traded methamphetamine for firearms. *Id.*at 113-114. Looney testified that Pickett asked Looney to modify one of the guns found at Pickett's residence to make it fire automatically. *Id.* at 116-117. Looney said he and Pickett tried out the silencers that Looney brought to Pickett. *Id.* at 117-118.

When Pickett's house was searched on March 3, 2023, Looney was at the home and answered the door. *Id.* at 111. The night before the search, Looney brought Pickett two pounds of methamphetamine. *Id.* at 111-112, 125.

According to Looney, James LaForce was (A) one of the couriers sent by Pickett to pick up Looney's drugs for Pickett, and (B) one of Pickett's customers. *Id.* at 108. LaForce himself testified and confirmed both points.

LaForce also corroborated Looney's testimony by confirming that Pickett obtained his methamphetamine from Looney, which LaForce had personally observed several times, usually at

Pickett's house. *Id.* at 141-142. LaForce testified the most methamphetamine he witnessed Pickett obtain from Looney was 2 to 2.5 pounds. *Id.* at 142.

When asked what Pickett did with the methamphetamine from Looney, LaForce was blunt: "We were selling it." *Id.* at 144. LaForce testified he sold methamphetamine "for" Pickett: "I'd just go pick it up and then take it to different places and sell it, and I would pay him when I got it sold." *Id.* at 138; accord *Id.* at 139. ("I'd pay him for it when I got paid for it. I'd bring the money back to him. It was on front."). Pickett provided LaForce about 4 ounces of methamphetamine at a time, once or twice a week—about half a pound per week. *Id.* at 138.

LaForce testified Pickett knew that LaForce was in turn "selling the meth [LaForce] bought from him" in late 2022 and early 2023. *Id.* at 139. LaForce explained he made drug deliveries for Pickett in exchange for Pickett giving LaForce "better deals" and "lower prices" on his own drugs. *Id.* at 140.

LaForce explained he and Pickett "started out low" and "as we sold more, we got more money to buy more," and that turning those profits was how Pickett afforded pounds of methamphetamine at a time from Looney. *Id.* at 143. LaForce testified he personally observed Pickett sell methamphetamine to four named individuals, as well as others whose names he did not know. *Id.* at 145. Two of those four people—Gabe Bentley and Chasity Holbrook—were also reselling the methamphetamine Pickett provided them. *Id.* And, like Looney, LaForce had witnessed Pickett keep drugs and guns together. *Id.* at 146-148. Pickett carried a gun when he went outside his home to sell drugs. *Id.* at 146. LaForce knew about an occasion on which Pickett traded meth for a firearm in late 2022. *Id.* at 147-148.

Indicted co-conspirator Chasity Holbrook, who lived with Pickett in October and November 2022, testified and admitted she regularly purchased drugs from Pickett from fall 2022

until March 2023. *Id.* at 160-184. Holbrook typically bought about four ounces of methamphetamine from Pickett at a time, "[u]sually once a week." *Id.* at 168-169. Holbrook then redistributed the drugs to others. *Id.* at 169-170. She testified she increased the price of the drugs when she resold them. *Id.*

Corroborating Looney and LaForce, Holbrook explained Pickett obtained his methamphetamine from Looney, which she knew because she saw such transactions occur at Pickett's home, sometimes as much as "up to two pounds" and "once a week." *Id.* at 171. On cross-examination, Holbrook reiterated that Looney was bringing several pounds of methamphetamine a week to Pickett. *Id.* at 180.

Holbrook testified that, when Looney supplied Pickett, Pickett placed the methamphetamine in bags in a safe and later gave the bags to his customers. *Id.* at 172. On one occasion, Holbrook saw "a lot" of methamphetamine inside Pickett's safe in his room. *Id.* at 178.

Pickett—who Holbrook saw with guns on occasion—also instructed Holbrook to falsely say the guns belonged to Pickett's son if anyone ever asked about it. *Id.* at 172-173.

Pickett did not put on a defense. The Court instructed the jury before closing. ECF No. 129. After deliberating, the jury convicted Pickett on all counts, except the machinegun charge in Count 8. ECF No. 133. At sentencing, the Court imposed a 20-year sentence. ECF No. 154.

Pickett appealed his conviction to the Court of Appeals. Dana Cormier was appointed to represent Pickett on appeal. Order, *United States v. Pickett*, No. 24-4406, ECF No. 2 (4th Cir. August 6, 2024). His sole argument on appeal was whether the evidence was sufficient to support the jury's verdict that Pickett joined a 500-gram methamphetamine conspiracy. Br. of Appellant, *Id.* at ECF No. 14 (4th Cir.).

The Fourth Circuit affirmed the judgment in an unpublished per curiam opinion. *Id.* at ECF No. 41; *United States v. Pickett*, No. 24-4406, 2025 WL 1219000 (4th Cir. Apr. 28, 2025). The mandate issued on May 20, 2025. *Id.* at ECF No. 45.

The instant § 2255 Petition was timely filed on July 28, 2025. ECF No. 178.

## STANDARD OF REVIEW

After conviction and exhaustion of appeals, the Court is "entitled to presume that [a defendant] stands fairly and finally convicted." *United States v. Frady*, 456 U.S. 152, 164 (1982). To overcome this presumption and obtain relief on a motion under 28 U.S.C. § 2255, a defendant must establish an error of "constitutional or jurisdictional magnitude" or an error which "could not have been raised on direct appeal, and if condoned, would result in a complete miscarriage of justice." *United States v. Shaid*, 937 F.2d 228, 233 & n.7 (5th Cir. 1991) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)).

To establish constitutionally ineffective assistance, a defendant must satisfy both prongs of a two-prong test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, he must show, considering all the circumstances, that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687-91. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. In making this determination, there is a strong presumption that counsel's performance fell within the wide range of reasonableness. *Strickland*, *Id.* at 689.

Second, a defendant must affirmatively prove prejudice, by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Id*. In conducting the analysis, "a court should

presume, absent challenge to the judgment of grounds of evidentiary insufficiency, that the judge or jury acted according to the law." *Id*. The court must consider "the totality of the evidence before the judge or jury," but "evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination." *Id.* at 694-95 (cleaned up).

The Court is not required to analyze the two prongs of the *Strickland* test in order. If a defendant fails to meet the burden of proving prejudice, the reviewing court need not even consider the performance prong. *Fields v. Attorney Gen. of Md.*, 956 F.2d 1290, 1297 (4th Cir. 1992).

## <u>ANALYSIS</u>

### I.    Counsel was not ineffective in failing to seek dismissal under the Speedy Trial Act and/or the Sixth Amendment.

The Speedy Trial Act requires that an information or indictment be filed within thirty days of an individual's arrest or service with a summons, and that a criminal trial commence within seventy days of the latest of the filing of the indictment, the information, or appearance. 18 U.S.C. § 3161(b) & (c)(1). Periods of delay may be excluded from the seventy-day period, for instance, for pretrial motions or when the ends of justice served by continuing the case outweigh the best interest of the public and the defendant in a speedy trial. 18 U.S.C. § 3161(h).

In Pickett's case, Pickett was arrested on April 24, 2023, and indicted within 30 days, on May 24, 2023. ECF Nos. 7, 24. His trial was initially scheduled to begin on July 18, 2023. ECF No. 31. However, on June 12 and June 13, 2023, respectively, Pickett and his attorney filed motions seeking that attorney's withdrawal as counsel for Pickett. ECF Nos. 39, 45. These motions were granted on June 14, 2023. ECF Nos. 50, 51.

On June 20, 2023, the government filed its Motion to Continue based on the unavailability of an essential witness, specifically one of the lab analysts who analyzed some of the

methamphetamine involved in the case. ECF No. 56. On June 27, 2023, newly appointed counsel for Pickett filed a response noting Pickett's objection to any continuance and his refusal to waive his right to a speedy trial, but also appropriately informing the Court of newly appointed counsel's need for additional time to properly prepare for Pickett's defense. ECF No. 58. On June 29, 2023, just 36 days after Pickett was indicted, the Court granted the government's motion to continue. ECF No. 63.

Per the Court's order, the period of time from June 29, 2023, when the Court entered the Order granting the motion to continue, until February 12, 2024, the rescheduled trial date, was properly excluded for speedy trial purposes pursuant to 18 U.S.C. § 3161(h)(3), (7). *Id.* So, while the entire period between Pickett's indictment and the commencement of his trial was 266 days, after deducting the 228 excluded days, Pickett was in fact tried less than seventy days after indictment. Thus, the Speedy Trial Act was not contravened. *See United States v. Kellam*, 568 F.3d 125, 138 (4th Cir. 2009) (rejecting defendant's contention that her rights under the Speedy Trial Act had been violated and calculating speedy trial excluding periods of delay pursuant to 18 U.S.C. § 3161(h)).

Likewise, the pretrial delay did not violate Pickett's Sixth Amendment right to a speedy trial. To assess whether a pretrial delay contravenes the Constitution's speedy trial guarantee, four considerations must be balanced: 1) the length of delay; (2) the reasons therefor; (3) the timeliness and vigor of the assertion of the speedy trial guarantee; and (4) prejudice to the defendant. *See Barker v. Wingo,* 407 U.S. 514, 530 (1972). Because, on balance, the factors do not weigh in Pickett's favor, the Sixth Amendment was not contravened.

The length of the delay, without regard to excluded time under the Speedy Trial Act, was 266 days. While this length of delay is considerably less time that the one year mark the Supreme

Court has observed as "presumptively prejudicial," this is the only factor that could arguably weigh in Pickett's favor. However, the reasons for the delay were valid. The unavailability of a critical witness is a valid reason to delay trial. *Barker*, 407 U.S. 514, 531 (1972) ("[A] valid reason, such as a missing witness, should serve to justify appropriate delay.") Additionally, Pickett fired two attorneys and a third attorney properly withdrew from representing Pickett due to a conflict. Therefore, the delay of trial was also necessary to allow for proper trial preparation by Pickett's counsel. *See United States v. Keith*, 61 F.4th 839, 853 (10th Cir.), *cert. denied*, 144 S. Ct. 420, 217 L. Ed. 2d 234 (2023) (noting delay for newly appointed counsel to review discovery and prepare for trial is a valid reason for delay). Importantly, there is no evidence of bad faith by the government or any attempt to obtain an impermissible advantage through the delay.[3]

As to the third factor, while Pickett never waived his right to a speedy trial and his objection to the requested continuance was noted by his counsel, Pickett also took actions that delayed trial, such as firing his counsel on two occasions. *See Id.* (instructing that courts must evaluate whether a defendant's behavior evinces a desire to go to trial).

The final factor, prejudice to the defendant, is "a prime issue and a 'critical factor.'" *Ricon v. Garrison*, 517 F.2d 628, 634 (4th Cir. 1975) (citing *United States v. Geller*, 481 F.2d 275, 276 (9th Cir. 1973); *United States v. Reynolds*, 489 F.2d 4, 7 (6th Cir. 1973)). Pickett has failed to show the delay may have adversely impacted the defense and has not pointed to any specific

---

[3] Undersigned counsel acknowledges that Pickett's filings contain conclusory allegations that the government "never intended to give him a speedy trial, and acted with malice" and the delay was "to build a stronger case" and "because the Government was not prepared for trial." *See e.g.*, ECF No. 179 at 9, 16. However, Pickett does not provide any factual support for these accusations. Therefore, the Court may dispense with these statements without further investigation. *United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) (vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court).

evidence of how the delay prejudiced him. For example, he has not identified any witness what

was unavailable or unable to accurately recall events, nor does he contend exculpatory evidence

was lost or unavailable due to the delay. *See United States v. Pair*, 84 F.4th 577, 590 (4th Cir.

2023), *cert. denied*, 144 S. Ct. 2589, 219 L. Ed. 2d 1244 (2024).

Considering all the factors, Pickett's constitutional right to a speedy trial was not

contravened. As such, because Pickett's rights under the Sixth Amendment and the Speedy Trial

Act were not violated, counsel for Pickett acted well within the objective standard of

reasonableness when they did not file a motion to dismiss the indictment for an alleged violation

of his rights to a speedy trial.[4] In fact, the likely effect of filing such motion would have been to

further delay trial. *See Id.* at 590 (noting that the defendant's motion to dismiss tolled his speedy

trial clock for roughly three months).

## II. Pickett cannot establish prejudice regarding alleged violations of Pickett's right to a speedy trial.

Even if Pickett were able to satisfy the first prong of *Strickland* with regard to counsels'

failure to move to dismiss on the basis of alleged violations of his right to a speedy trial, his claim

fails because he cannot show that these errors actually had an adverse effect on the defense.

As outlined above, Pickett's right to a speedy trial was not violated, so any Motion to

Dismiss would have been futile. But even if a Motion to Dismiss had succeeded, such dismissal

would have been without prejudice. *See* 18 U.S.C. § 3162(a)(2) (listing factors for courts to

consider in deciding whether to dismiss without or without prejudice); *United States v. Thomas*,

---

[4] In this response the government has treated Pickett's speedy trial claims as claims that his
counsel was ineffective for failure to move to dismiss on the basis of speedy trial, since any
claim that Pickett's right to a speedy trial was violated is procedurally defaulted and cannot be
raised for the first time on collateral review unless the defendant can show cause and prejudice.
*United States v. Mikalajunas*, 186 F.3d 490, 492 (4th Cir. 1999).

305 F. App'x 960 (4th Cir. 2009) (finding that counsel's failure to move to dismiss the indictment based on the Speedy Trial Act was not prejudicial because dismissal would have been without prejudice). Thus, there is no reasonable probability that the result of the proceeding would have been different, as Pickett would have simply been reindicted, placing him in the same posture as before the dismissal. *United States v. Rushin*, 642 F.3d 1299, 1309-10 (10th Cir. 2011) (holding prejudice not shown where violation would have resulted in dismissal without prejudice).

Because Pickett can meet neither prong of the *Strickland* test as to his Speedy Trial claim, since his attorneys' performance was reasonable and there was no prejudice from the failure to file a motion to dismiss, his claim on this basis must be dismissed.

### III. Pickett's counsel was not ineffective in his development of Pickett's defense and there was no prejudice from counsel's strategic decisions.

Pickett's second claim is that his counsel was ineffective for "failing to develop an adequate defense." His specific complaints are that his counsel: (1) did not obtain video evidence from body cameras and surveillance cameras, (2) did not request a spoliation instruction, (3) did not introduce the entirety of the controlled buy videos to the jury, and (4) did not request and order testing of physical evidence for fingerprints and DNA. ECF No. 179 at 20-25. Addressing each of these in turn below, counsel was not ineffective for failing to take these steps and Pickett's defense was not prejudiced. Therefore, Pickett's claim on this basis should be dismissed.

**Counsel was not ineffective for failing to obtain alleged video evidence from Coeburn police body cameras and Pickett's home surveillance system.** Pickett claims that this footage would have shown James Looney getting the combination to the safe in Pickett's bedroom, bringing drugs and firearms onto the property, and placing them in movant's safe after Pickett was arrested. *Id.* at 21-22. As a threshold matter, Pickett provides no support for the notion that such video evidence even existed. While there was discussion of security cameras in Pickett's home

during trial (e.g. ECF No. 165 at 42, 73, 149, 151), there was no testimony indicating that any footage from the cameras was seized. Likewise, the alleged Coeburn Police body camera footage has been invented by Pickett whole cloth, as there was no discussion of body cameras by Officer Swindall or anyone else at trial. However, the Court need not determine whether such footage existed because even assuming such video did exist, Pickett's claims on this basis fail.

To the extent Pickett claims that the alleged video would have provided an alibi for the items found during the search of Pickett's home, his claim is nonsensical and self-defeating. Pickett claims the video would show James Looney bringing drugs and firearms to the residence **after Pickett's arrest.** Even if this were true, it would not provide an alibi for Pickett as to the drugs and firearms law enforcement seized during their search of the residence.

Officer Westley Swindall testified about the sequence of events that occurred on the day of Pickett's arrest and the search of his residence. As he explained, a male subject came to the door, then Pickett. ECF No. 165 at 9-10. Pickett gave Officer Swindall permission to search the residence for Jessica Chenault. *Id.* at 11. There were multiple individuals in the home who "moved to the living room and stayed there" during the search. *Id.* at 12. Once Officer Swindall found a box of ammunition in the closet in Pickett's bedroom and saw a rifle case in another bedroom, he asked the individuals to leave the residence. *Id.* Officer Swindall then contacted his captain and obtained a search warrant through the magistrate's office. *Id.* at 13. He then personally executed the search warrant and found ammunition, methamphetamine, psychedelic mushrooms, a machine gun, and numerous other firearms. *Id.*

If Officer Swindall had observed any individual bringing guns or drugs and placing them in the safe or elsewhere in the residence this significant fact would have featured prominently in Officer Swindall's testimony about the events on the date of the Pickett's arrest. It is nonsensical

for Pickett to claim that Officer Swindall's body camera, or other officers' body cameras, would have captured Looney bringing the guns and drugs to the residence while they were searching the residence.

As to the alleged video from the surveillance cameras, even assuming Pickett's claim is true and video footage would have shown James Looney bringing guns and drugs to Pickett's residence and placing them in Pickett's bedroom closet safe **<u>after</u>** Pickett's arrest, this evidence would not exonerate Pickett. At most, Looney could have been cross-examined about his possession of firearms and drugs at Pickett's residence after Pickett's arrest. However, Looney himself testified that he possessed and even modified firearms and dealt large quantities of methamphetamine. *See, e.g.,* ECF No. 165 at 105-106, 116.

It was no secret that Looney was at Pickett's house prior to Pickett's arrest and the search. *See Id.* at 111. Looney even testified that he (Looney) was the one who brought the two pounds of methamphetamine to Pickett prior to Pickett's arrest and the search. ECF No. 165 at 111-112. So, even if the Court assumes that the alleged video footage exists and assumes that it shows what Pickett claims it would show, the video would not have exonerated Pickett and would have been of limited value in impeaching James Looney. Therefore, Pickett's counsel was not ineffective for failing to obtain the alleged video and Pickett did not suffer any prejudice from his counsel alleged failure to obtain it.

**Counsel was not ineffective for failing to request a spoliation instruction based upon the alleged Coeburn police body cameras and video from Pickett's home surveillance system.** Again, even if the Court assumes the alleged video footage existed, no remedy would have been warranted for its "loss." The Supreme Court has issued two opinions addressing how the loss or destruction of evidence impacts a defendant's due process right: *California v. Trombetta*, 467 U.S.

479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988). These cases provide the standard that would have been applicable in Pickett's case.

Based on *Trombetta* and *Youngblood*, an analysis of a claim that the government violated a defendant's due process rights by failing to preserve evidence involves the following steps:

> To begin with, the court must determine whether the lost evidence is exculpatory or only potentially exculpatory. In resolving this initial question, the court must consider whether the evidence's exculpatory value was apparent to law enforcement. If so, the court then considers whether the defendant can obtain comparable evidence through reasonably available means. But if not, then the court must assess whether the loss of the evidence was due to law enforcement's bad-faith conduct. The bad-faith standard requires more than a showing that evidence was lost because of the negligence of government actors.

*United States v. Williams*, No. 5:22-MJ-01805-RN-1, 2024 WL 326787, at *5 (E.D.N.C. Jan. 26, 2024).

As outlined above, there is no indication in this case that the video footage that Pickett alleges was not preserved[5] was exculpatory or that it had exculpatory value that would have been apparent to the officers. Additionally, Pickett could obtain comparable evidence through reasonably available means through the testimony of Officer Westley Swindall, who would presumably have observed anything that would have been captured on his own body camera.

There is no obligation to preserve inculpatory evidence or evidence that would not be expected to play a significant role in the suspect's defense, and there is thus no due process violation if such evidence is not preserved.  *Trombetta*, 467 U.S. at 488 (the government's

---

[5] Pickett never even alleges that the surveillance video was seized, or could have properly been seized, by law enforcement. However, as stated above, the Court need not even reach the issue of the existence of the video or whether it was in the custody and control of law enforcement, as the purported content of the video would have only been of negligible (if any) value to Pickett's defense.

constitutional obligation to preserve evidence "must be limited to evidence that might be expected to play a significant role in the suspect's defense"). Here, the alleged video footage of what occurred **after** Pickett's arrest would not have played any significant role in his defense. Thus, there was no due process violation to remedy through a spoliation instruction.

Further, even if the Court believed the video footage to be potentially exculpatory, Pickett has not alleged that the failure to preserve the alleged videos or their destruction was done in bad faith. The Fourth Circuit has repeatedly applied the bad-faith standard for potentially exculpatory audio and video records that have been lost or destroyed. *Id.* (citing *United States v. Adetayo*, 682 F. App'x 216, 216–17 (4th Cir. 2017) (affirming the denial of a motion to dismiss based on destruction of video evidence because of lack of bad faith); *United States v. Thompson*, 584 F. App'x 101 (4th Cir. 2014) (applying the bad-faith standard to the destruction of footage of a traffic stop); *United States v. Hawkins*, 531 F. App'x 342, 344 (4th Cir. 2013) (concluding that a defendant needed to show bad faith to establish a due process violation based on selective preservation of video footage); *United States v. Montieth*, 662 F.3d 660, 666 n.1 (4th Cir. 2011) (finding no due process violation in the destruction of footage of a traffic stop because there was "no bad faith on the part of law enforcement in the tape's destruction."); *United States v. Bloodworth*, 412 F. App'x 639, 640 (4th Cir. 2011) (rejecting due process challenge to destruction of audio recording of traffic stop because of lack of bad faith); *United States v. Wright*, 333 F. App'x 772, 777 (4th Cir. 2009) (determining, under the bad-faith standard, whether to grant a motion for judgment of acquittal based on loss of an audio recording); *United States v. Henderson*, 41 F. App'x 651, 652 (4th Cir. 2002) (holding that destruction of a recording of an officer's earlier testimony did not violate the due process clause because "there is no evidence of bad faith"); *United States v.*

*McClure*, 918 F.2d 956, 1990 WL 180122, at *5–6 (4th Cir. 1990) (unpublished) (relying on *Youngblood*'s bad-faith standard when officers failed to obtain video footage of bank robbery)).

Since there is not even an allegation that the alleged video was lost due to bad faith, there was no due process violation and Pickett would not have been entitled to a spoliation instruction. Therefore, Pickett's counsel acted within the objective standard of reasonableness by not requesting a spoliation instruction. Likewise, Pickett's defense was not adversely affected because he was not entitled to a spoliation instruction, even if the Court assumes his allegations are true.

**Counsel was not ineffective for failing to introduce the entirety of the controlled buy videos to the jury.** Pickett claims his counsel was ineffective for failing to watch and introduce the complete controlled buy videos. ECF No. 179 at 23. He claims that the clips shown by the government were "misleading" because they omitted a portion of Pickett "rejecting any offer to purchase firearms" in one of the videos with words to the effect of: "I am a convicted felon and don't mess with guns." *Id.* at 23-24. Pickett points to no other portions of the controlled buy videos that were "favorable to the defendant," or that he claims should have been presented to the jury. *Id.*

While Pickett claims that the portion of the videos summarized above was favorable to his defense and his counsel should have introduced it, counsel acted reasonably by not introducing this portion of the controlled buy video. The video portion described by Pickett served to underscore not only Pickett's felon status, but also Pickett's awareness that he was a felon. It is not uncommon for defendants to request exclusion of this type of evidence as prejudicial or for Court's to grant such requests on occasions when the evidence is cumulative. *See, e.g.*, *United States v. George*, 597 F. Supp. 3d 832, 841 (E.D.N.C. 2022).

Counsel's decisions about what evidence should or should not be introduced is a tactical and strategic decision which is given "wide latitude" in the context of an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 689 (1984). *See also United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) ("Decisions that may be made without the defendant's consent primarily involve trial strategy and tactics, such as what evidence should be introduced, what stipulations should be made, [and] what objections should be raised . . . ." (quoting *Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998))). Tactical and strategic decisions are "not unreasonable simply because the client expressed a contrary view." *Chapman*, 593 F.3d at 369. Counsel's decision here, not to introduce the portion of the clip where Pickett acknowledged he was a felon and declined to purchase a firearm, was entirely reasonable and was not ineffective assistance of counsel.

Additionally, there was no prejudice to Pickett from counsel's decision not to introduce this video footage. The evidence at trial of Pickett's possession of firearms was overwhelming. In addition to the five firearms and numerous firearm parts, magazines, and rounds of ammunition found in Pickett's residence, three co-conspirators who had drug relationships with Pickett testified regarding his possession and use of firearms during the course of the methamphetamine trafficking conspiracy.

**Counsel was not ineffective for failing to request and order testing of physical evidence for fingerprints and DNA.** Pickett claims his counsel was ineffective for failing to request and order fingerprint and DNA testing of the physical evidence. ECF No. 179 at 24-25. He does not specify what "physical evidence" he references and presumably refers to all physical exhibits introduced at trial. Similarly, he does not specify what he claims such testing would show, though he implies they would "prove his innocence." *Id.*

Counsel's decision to forego seeking forensic testing is, like the decision about whether or not to introduce the complete buy videos, a tactical and strategic decision within counsel's wide latitude of reasonableness and is entitled to great deference. Counsel's decision not to seek forensic testing and his assessment and balancing of perceived benefits against perceived risks under these circumstances—where the physical evidence was found at Pickett's residence, there were three audio and video recorded controlled buys, and multiple witnesses testified regarding Pickett's methamphetamine trafficking and use of firearms—was entirely reasonable and was not ineffective assistance of counsel.

Additionally, Pickett's premise is faulty and self-serving. The fact that a test has not been performed does not necessarily mean the unknown results would have exonerated him. Instead, given that the vast majority of physical evidence was found in Pickett's residence, the greater likelihood is that Pickett's DNA and fingerprints (to the extent any were detectable) would have been present on the exhibits. Additionally, the lack of Pickett's identifiable fingerprints and/or DNA on the exhibits would not necessarily exonerate Pickett. Any multitude of reasons could explain the absence of Pickett's DNA and fingerprints, such as forensic evidence being inadvertently obliterated by law enforcement when the evidence was secured and transferred through the chain of custody or evidence having been wiped down deliberately prior to the search of the residence. *See Banks v. United States*, No. 5:05CR30, 2010 WL 3855065, at *7 (N.D.W. Va. July 21, 2010), *report and recommendation adopted*, No. 5:05CR30, 2010 WL 3854426 (N.D.W. Va. Sept. 29, 2010). For these reasons, Pickett's claim that forensic testing would have exonerated him is unsubstantiated and is simply a conclusory claim of prejudice that must fail. *See United States v. Terry,* 366 F.3d 312, 316 (4th Cir. 2004) ("[C]onclusory allegations are insufficient to establish the requisite prejudice under *Strickland.*").

22

IV.    **Pickett's counsel was not ineffective for withdrawing due to a potential conflict and Pickett did not suffer any prejudice due to counsel's withdrawal.**

Pickett was represented by a total of five attorneys: three attorneys who represented him pretrial, a fourth attorney who represented him pretrial and at trial, and a fifth attorney who represented him on appeal. His claim regarding denial of conflict-free counsel relates to only the third of those five attorneys, attorney Donald Williams. Mr. Williams represented Pickett for a period of 43 days, from October 16 to November 28, 2023. ECF Nos. 91, 94.

In order to advance a conflict-of-interest claim, Pickett must show that his lawyer operated under a conflict of interest and that such conflict adversely affected his lawyer's performance. *United States v. Nicholson*, 611 F.3d 191, 206 (4th Cir.2010) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Pickett's claim fails on both counts.

First, Mr. Williams did not operate under a conflict of interest. Upon reviewing discovery, Mr. Williams immediately identified the *potential* conflict presented, specifically that he represented two of the officers involved in Pickett's investigation in other cases and could not effectively cross-examine them at trial. ECF No. 93. Consistent with his obligation to Pickett and the Court, Mr. Williams informed the Court of the potential conflict and moved to withdraw as counsel. *Mickens v. Taylor*, 240 F.3d 348, 357 (4th Cir. 2001), aff'd, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) (noting that defense attorneys are obligated to inform the court of conflicts of interest). His motion was granted and the potential conflict never came to fruition.

Second, Mr. Williams' potential conflict did not adversely affect his performance. While Pickett makes conclusory allegations that Mr. Williams' potential conflict "critically impacted his defense" and that "the six (6) week delay caused significant prejudice," he fails to offer any specifics. ECF No. 179 at 28-29. Pickett does not point to any actions taken by Mr. Williams that were detrimental to Pickett's case, and, in fact, he emphasizes that Mr. Williams performed

minimal work during his representation of Pickett. *See Id.* at 27 (emphasizing that Mr. Williams met with Pickett on only one occasion and briefly discussed the case, and that "no work was done on [Pickett's] case").

However, Pickett does not articulate any specific actions that needed to be performed during this six-week period or how the delay had an adverse impact of Pickett's case. For example, there were no missed deadlines or pretrial hearings during this timeframe. Upon Mr. Williams' withdrawal, Pickett was appointed new counsel, Charles Bledsoe, who had 79 days to prepare for trial. ECF No. 94-95. Pickett does not claim that his trial counsel was unable to prepare for trial in this length of time. In short, because Pickett only makes vague and conclusory allegations regarding any adverse impact Mr. Williams' potential conflict presented, his claim on this basis must be dismissed. *United States v. Dyess*, 730 F.3d 354, 359 (4th Cir. 2013) (vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court).

## **CONCLUSION**

For the above reasons, Pickett has not stated any claim upon which relief can be granted. His Petition should be dismissed.

Respectfully submitted,

ROBERT N. TRACCI
Acting United States Attorney

s/*Danielle Stone*
Danielle Stone
Assistant United States Attorney
Virginia Bar No. 84503
United States Attorney's Office
180 W. Main Street, Suite B19
Abingdon, Virginia 24210

24

Telephone:  276-628-4161
Fax:  276-628-7399

## <u>CERTIFICATE OF SERVICE</u>

I certify on this date, November 10, 2025, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, and caused to be sent a copy via first class mail to:

Rodney Pickett, Reg. No. 55418-510
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

/s/ Danielle Stone